# In the
# United States Court of Appeals
## for the Eighth Circuit

Rebecca Smith, on her own behalf and on behalf of all others similarly situated;
Cristine M. Ghanim, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

v.

UnitedHealth Group Inc.; United HealthCare Services, Inc.; United HealthCare
Insurance Company; United Medical Resources; United Healthcare Service LLC;
Doe Defendants, 1-10,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the District of Minnesota, No. 0:22-cv-01658-MEB.
The Honorable Nancy Ellen Brasel, Judge Presiding.

## BRIEF OF DEFENDANTS-APPELLEES

MICHELLE S. GRANT
(grant.michelle@dorsey.com)
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
(612) 340-5671

GREGORY F. JACOB
(gjacob@omm.com)
BRIAN D. BOYLE
(bboyle@omm.com)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
(202) 383-5327

*Counsel for Defendants-Appellees*
*UnitedHealth Group, Inc.; United HealthCare Services, Inc.; United HealthCare*
*Insurance Company; United Medical Resources; United HealthCare Service LLC*



## SUMMARY OF THE CASE

Plaintiffs' health care plan benefits were paid to their providers through a combination of cash and debt cancellation in *exactly* the manner their plans specified—a manner voluntarily chosen by their plans to facilitate overpayment recoveries. United reported to the providers the precise amount and manner of payment, and, in the intervening years, the providers have done nothing to seek any additional amounts from Plaintiffs. The complaint alleges billions of dollars have been paid to providers in exactly the same manner, yet Plaintiffs do not identify a single instance in which a provider ever attempted to collect more from a patient on the grounds that this form of payment was not valid. The district court correctly determined that Plaintiffs lack Article III standing to challenge their plans' form of payment because Plaintiffs have suffered no concrete harm.

Plaintiffs contend that this payment mechanism violates ERISA. But assertions of illegality do not create standing in the absence of concrete harm. Nor do Plaintiffs allege "benefit of the bargain" harm, as Plaintiffs got precisely the bargain their plans promised: their benefits were paid to their providers under the precise terms of their plans. No court has held that a court can first rewrite a contract term that has caused no concrete harm to a plaintiff, and then base "benefit of the bargain" standing on that rewritten term.

United requests oral argument of 20 minutes per side.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel state that:

1. Defendant UnitedHealth Group Incorporated, a publicly held corporation, does not have a parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

2. Defendant United HealthCare Services, Inc. is a 100%-owned subsidiary of Defendant UnitedHealth Group Incorporated.

3. Defendant UnitedHealthcare Insurance Company is a 100%-owned subsidiary of UHIC Holdings, Inc., and UHIC Holdings, Inc. is a 100%-owned subsidiary of Defendant United HealthCare Services, Inc.

4. United Medical Resources is a 100%-owned subsidiary of UnitedHealth Group Incorporated.

5. Defendant UnitedHealthcare Service LLC is a 100%-owned subsidiary of Defendant United HealthCare Insurance Company.

Appellate Case: 23-2369     Page: 3     Date Filed: 10/13/2023 Entry ID: 5326098

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE.................................................................i

CORPORATE DISCLOSURE STATEMENT ..............................ii

STATEMENT OF THE ISSUES AND APPOSITE AUTHORITIES ...................1

STATEMENT OF THE CASE..................................................1

    I.    Factual Background..................................................1

        A.    The role of cross-plan offsetting in facilitating recovery of overpayments..................................2

        B.    United's payment of Plaintiffs' providers using payment methods expressly specified in Plaintiffs' plans...................7

    II.    Procedural Background.............................................10

SUMMARY OF THE ARGUMENT ..................................12

ARGUMENT ...............................................................14

    I.    Plaintiffs Do Not Have "Benefit Of The Bargain" Injury Because They Allege That They *Received* The Benefits Of The Bargain. ....................................15

    II.    Plaintiffs' Bid to Have Their Plans Reformed—Even If Supported By The Complaint—Is A Disguised Effort To Impermissibly Seek Standing Based Merely On An Alleged Statutory Violation. ...........................22

        A.    Plaintiffs may not assert "benefit of the bargain" standing based on a bargain that does not exist.....................23

        B.    Standing cannot be based on claims not alleged. ...................25

    III.    Plaintiffs Do Not Allege That They Suffered Any Economic Loss.............................................26

        A.    Plaintiffs do not allege any out-of-pocket loss. ......................27

        B.    Plaintiffs do not assert that they risk future economic loss...................................27

        C.    Plaintiffs' conclusory assertion that payment by cross-plan offsetting is less "valuable" to them is not supported by any factual allegations in the Complaint.............................31

    IV.    Alleged Violations Of ERISA Do Not Create Standing In The Absence Of Concrete Harm. ..............................35

Appellate Case: 23-2369    Page: 4    Date Filed: 10/13/2023    Entry ID: 5326098

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION ........................................................................36

iv

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ahlberg v. Chrysler Corp*,
481 F.3d 630 (8th Cir. 2007)..................................................................28

*Ashanti v. City of Golden Valley*,
666 F.3d 1148 (8th Cir. 2012) ...............................................................9

*Auctus Fund, LLC v. Drone Gaurder, Inc.*,
2023 WL 2401014 (D. Mass. Mar. 8, 2023)........................................22

*Auer v. Trans Union, LLC.*,
902 F.3d 873 (8th Cir. 2018)........................................................ 25, 34

*Bassett v. Credit Bureau Servs., Inc.*,
60 F.4th 1132 (8th Cir. 2023) ...............................................................32

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*,
115 F.3d 1372 (8th Cir. 1997) ...............................................................32

*Braitberg v. Charter Commc'ns, Inc.*,
836 F.3d 925 (8th Cir. 2016).................................................... 17, 33, 34

*Carlsen v. GameStop, Inc.*,
833 F.3d 903 (8th Cir. 2016)..................................................................16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...............................................................................28

*Clarke v. Bowen*,
843 F.2d 271 (8th Cir. 1988)..................................................................26

*Cox v. Mortg, Elec. Registration Sys., Inc.*,
685 F.3d 663 (8th Cir. 2012) ........................................................ 28, 36

*Huyer v. Van de Vorde*,
847 F.3d 983 (8th Cir. 2017)..................................................................33

*In re Fid. ERISA Float Litig.*,
829 F.3d 55 (1st Cir. 2016) ...................................................................10

v

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017)...................................................................... 23, 32

*Liscomb v. Boyce*,
954 F.3d 1151 (8th Cir. 2020) ..............................................................28

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................ 1, 15, 32

*Mahler v. First Dakota Title Ltd. P'ship*,
931 F.3d 799 (8th Cir. 2019)..................................................................28

*McNaught v. Nolen*,
76 F.4th 764 (8th Cir. 2023) ................................................... 28, 30, 34

*Mitchell v. Blue Cross Blue Shield of N.D.*,
953 F.3d 529 (8th Cir. 2020)............................................... 1, 18, 19, 20

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*,
781 F.3d 182 (5th Cir. 2015)..................................................................21

*Ojogwu v. Rodenburg Law Firm*,
26 F.4th 457 (8th Cir. 2022) ......................................................... 17, 34

*Peterson v. UnitedHealth Group, Inc.*,
242 F. Supp. 3d 834 (D. Minn. 2017), *aff'd*, 913 F.3d 769 (8th Cir.
2019)...................................................................................... 4, 5, 30

*Peterson v. UnitedHealth Group, Inc.*,
913 F.3d 769 (8th Cir. 2019).........................................................4, 7

*Raeburn v. Gibson*,
2021 WL 3871916 (8th Cir. Aug. 31, 2021) ......................................36

*Ryan S. v. UnitedHealth Group*,
2022 WL 883743 (9th Cir. Mar. 24, 2022)................................... 28, 30

*Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*,
584 F.3d 253 (6th Cir. 2009)..................................................................25

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ..................................................................... passim

Appellate Case: 23-2369      Page: 7      Date Filed: 10/13/2023 Entry ID: 5326098

**Page(s)**

*Springer v. Cleveland Clinic Emp. Health Plan Total Care*,
  900 F.3d 284 (6th Cir. 2018)..................................................................21

*Thole v. U.S. Bank N.A*,
  140 S. Ct. 1615 (2020) ................................................................. passim

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................................. passim

*United States. ex rel. Hall v. Creative Games Tech., Inc.*,
  27 F.3d 572, 1994 WL 320296 (8th Cir. July 5, 1994) ......................................25

*Wiener v. E. Ark. Planting Co.*,
  975 F.2d 1350 (8th Cir. 1992) ...........................................................26

**Other Authorities**

CMS Medicare Learning Network, *Medicare Fraud & Abuse:*
  *Prevent, Detect, Report* (Jan. 2021)......................................................4

DOL Advisory Opinion 77-08, 1977 WL 5394.........................................................3

Appellate Case: 23-2369     Page: 8     Date Filed: 10/13/2023 Entry ID: 5326098

## STATEMENT OF THE ISSUES AND APPOSITE AUTHORITIES

1.     Whether Article III standing can be based on denial of plan benefits where benefits have been paid in accordance with the terms of Plaintiffs' plans.

Most apposite authority:

- *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529 (8th Cir. 2020)

2.     Whether Plaintiffs adequately allege Article III standing where their claims are based entirely on alleged harms to their health care providers, and they do not allege any harm to themselves personally.

Most apposite authorities:

- *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021)
- *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)
- *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)
- *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020)

## STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

The allegations in the Amended Complaint, App. 11-41; R. Doc. 35 at 11-41 ("Complaint"), establish that Defendants-Appellees ("United") made payments for health care services received by Plaintiffs-Appellants ("Plaintiffs") in precisely the manner provided for by the terms of Plaintiffs' health care plans.  Plaintiffs expressly allege that their plans allow for payment to health care providers by debt cancellation via United's cross-plan offsetting program.  App. 14; R. Doc. 35 at 14

1

¶ 31; App. 172-78; R. Doc. 44-1 at 2-8; App. 193-94, 207-08, 212, 226, 231, 242 ; R. Doc. 45-1 at 4-5, 18-19, 23, 37, 42, 53.

The Complaint also establishes that Plaintiffs have neither suffered an actual, concrete injury nor are imminently threatened with one. Cross-plan offsetting has not cost them a penny, nor do they allege that there is a remote likelihood that it ever will. To the contrary, in the more than two years since their health care providers were notified of the offsets at issue here, neither provider is alleged to have either requested a payment for the amount offset or even asserted that they believe Plaintiffs are in debt to them for those amounts.

In short, Plaintiffs have received the precise benefits they were promised. Their health care providers have been compensated in exactly the manner provided for in their plans. And Plaintiffs allege no adverse consequences to themselves as a result of United's compliance with the terms of Plaintiffs' plans.

A.    The role of cross-plan offsetting in facilitating recovery of overpayments.

Plaintiffs' claims concern a method for recovering overpayments made to health care providers that United and other insurers offer to health benefit plans. This process is typically referred to as "cross-plan offsetting" or "bulk recovery." App. 55; R. Doc. 60 at 2. The Complaint makes clear that both of Plaintiffs' health care plans voluntarily elected to adopt cross-plan offsetting, and included express authorizing language in their plan documents. App. 22; R. Doc. 35 at 22.

2

Overpayments to health care providers are a result of complex health care and benefits coverage rules. Overstretched providers occasionally make billing errors resulting in overpayments, and, without deprecating the legions of honest health care providers, it remains the case that fraud is a chronic problem in health care billing, costing Medicare alone billions of dollars a year.[1] And, as the largest health insurance company in the United States, App. 9-10; R. Doc. 35 at 9-10 ¶ 16, United administers a "massive volume" of claims and will inevitably make errors itself from time to time by paying providers more than they are entitled to under the terms of a patient's plan. App. 55; R. Doc. 60 at 2. But overpayments—even those resulting from honest mistakes—must be recovered to preserve plan assets for legitimate claims. *See* DOL Advisory Opinion 77-08, 1977 WL 5394 *2 (plan fiduciaries "must attempt . . . to recover erroneous payments made from a plan"). A system in which most overpayments are essentially unrecoverable, or recoverable only with considerable delay, is a system that invites overbilling, and even outright fraud. Plans like Plaintiffs' elect to adopt cross-plan offsetting because it is the most effective means available of recovering their own overpayments. App. 173-178; R. Doc. 44-1 at 3-8.

Plaintiffs' health care plans are "self-funded," meaning that the plans

---

[1] CMS Medicare Learning Network, *Medicare Fraud & Abuse: Prevent, Detect, Report*, 5 (Jan. 2021), https://www.cms.gov/Outreach-and-Education/Medicare-

Appellate Case: 23-2369    Page: 11    Date Filed: 10/13/2023 Entry ID: 5326098

themselves—not United—are responsible for paying their claims, App. 55, 59; R. Doc. 60 at 2, 6, and, accordingly, suffer the losses resulting from any overpayments. When a plan is self-funded, payments to health care providers are drawn from payroll contributions by the plan's participants and contributions by the plan's employer-sponsor. *Id.*[2] Recovery of overpayments thus benefits the plan's participants and the employer-sponsor, by making more funds available for future claims and dampening the need for increased employee and employer contributions.

Plaintiffs themselves recognize the utility of cross-plan offsetting in correcting overpayment errors by alleging that United's program has recovered billions of dollars in overpayments on behalf of self-funded health care plans in recent years. App. 28; R. Doc. 35 at 28 ¶¶ 63-64. This is unquestionably a benefit to self-funded plans like Plaintiffs'.

To describe cross-plan offsetting, the court relied substantially on Judge Schiltz's fulsome summary from *Peterson v. UnitedHealth*. App. 55-56; R. Doc. 60 at 2-3 (quoting *Peterson v. UnitedHealth Group, Inc.*, 242 F. Supp. 3d 834, 837 (D. Minn. 2017), *aff'd*, 913 F.3d 769 (8th Cir. 2019) (*Peterson II*)). As Judge

---

Learning-Network-MLN/MLNProducts/Downloads/Fraud-Abuse-MLN4649244.pdf.

[2] United also administers fully-insured plans where employers pay United premiums on behalf of their employees and United pays for covered expenses out of its own funds. App. 55; R. Doc. 60 at 2.

Appellate Case: 23-2369   Page: 12   Date Filed: 10/13/2023 Entry ID: 5326098

Schiltz explained, if a provider declines to repay when asked to do so, plans have limited options on their own. *Peterson*, 242 F. Supp. 3d at 837. The plans can pursue litigation, which may involve costs that exceed any likely recovery, or wait until another member of their plan visits the same provider and deduct the prior overpayment from the subsequent payment. *Id*. While this "same plan offsetting" is more practical than litigation, the result is uncertain because there is no guarantee that a member of the same healthcare plan will ever visit that same provider. *Id*. Thus, the healthcare plan "may never have the opportunity" to recover its overpayment. *Id*. This practical inability to recover most overpayments is a "straight to the bottom line" cost to self-funded plans.

Cross-plan offsetting solves this problem by empowering health care plans to use the entire network of United's participating plans to recover overpayments when any member of a United-administered health care plan visits a provider. *Id*. Under cross-plan offsetting, United may recover the overpayment from any payment owed to the provider from any of its administered plans and credit the recovered overpayment back to the plan that made the overpayment. App. 173-74; R. Doc. 44-1 at 3. In short, under this process, an identified overpayment to a provider can be recouped through an offset from any payment currently owed to that provider, whether or not the payment currently owed is from the same plan as the plan that made the overpayment. Hence, the "cross-plan" nomenclature.

5

To illustrate, assume hypothetical Patient 1 is a member of Plan A. Patient 1 visits Dr. Smith, receives services, and United pays Dr. Smith $200. United subsequently determines that Dr. Smith was overpaid by $100 and seeks recovery. Dr. Smith would first receive a letter notifying him of the overpayment determination, including an explanation of his options for contesting it through United's appeals process. App. 175; R. Doc. 44-1 at 5; App. 249; R. Doc. 45-1 at 60. If Dr. Smith repays the overpayment, or successfully appeals the determination that he was previously overpaid, that is the end of the matter. If Dr. Smith declines to appeal or is unsuccessful in doing so, and fails to return the overpayment, United may seek to recover the overpayment through cross-plan offsetting as follows. Assume that hypothetical Patient 2, a member of Plan B, visits Dr. Smith and receives services for which his plan benefit is $150. Because Dr. Smith owes Plan A $100 for the overpayment for services to Patient 1 (the Plan A member), United will offset that $100 against the $150 that it would otherwise pay to Dr. Smith for Patient 2 (the Plan B member). Plan A is made whole, and Dr. Smith's debt of $100 for the overpayment on his services to Patient 1 is forgiven. Under cross-plan offsetting, both Plan A and Plan B have the opportunity to recover their overpayments by using debt cancellation from other plans as a form of payment.

The plans that participate in cross-plan offsetting are only those that expressly have chosen to do so. App. 172; R. Doc. 44-1 at 2. In its 2019 ruling in

Appellate Case: 23-2369    Page: 14    Date Filed: 10/13/2023 Entry ID: 5326098

*Peterson II*, 913 F.3d at 775, this Court held that certain plan documents that lacked express cross-plan offsetting authority did not adequately authorize United to engage in the practice. Since that time, United has required all plans that wish to participate in this process to include clear authorizing language in their plan documents. Plaintiffs do not suggest that there is any deficiency in the current authorizing plan language.

Cross-plan offsetting is a widespread practice that Plaintiffs concede has provided billions of dollars in recoveries for self-funded plans. App. 28; R. Doc. 35 at 28 ¶¶ 63-64. Between 2018 and 2020, self-funded plans recovered approximately $800 million in recoveries *per year* through United's cross-plan offsetting program, amounting to recovery of 81-85% of their overpayments. App. 28; R. Doc. 35 at 28 ¶ 64. Despite the ubiquity of cross-plan offsetting, Plaintiffs do not allege that any provider has ever pursued a patient for an amount offset via this process. App. 67; R. Doc. 60 at 14.

B. United's payment of Plaintiffs' providers using payment methods expressly specified in Plaintiffs' plans.

Plaintiffs Rebecca Smith and Christine Ghanim are participants in United-administered, self-funded, health care plans sponsored by their or their spouse's employers. App. 59; R. Doc. 60 at 6.

Like all United plans now participating in cross-plan offsetting, both of Plaintiffs' plans expressly instructed United to use the cross-plan offsetting

7

mechanism for recovery of overpayments.  App. 14; R. Doc. 35 at 14 ¶ 31; App. 172-78; R. Doc. 44-1 at 2-8; App. 193-94, 207-08, 212, 226, 231, 242 ; R. Doc. 45-1 at 4-5, 18-19, 23, 37, 42, 53.  As alleged in the Complaint, United provided a fulsome disclosure of this program to all self-funded plans.  App. 172; R. Doc. 44-1 at 2 ("UnitedHealthcare's Overpayment Bulk Recovery Process") (the "Disclosure").  The Disclosure notified plans of this court's decision in *Peterson II* and described United's offsetting procedures.  App. 173-178; R. Doc. 44-1 at 3-8.  The Disclosure also informed plans of the benefits and risks of cross-plan offsetting.  App. 174-176; R. Doc. 44-1 at 4-6.[3]

Most importantly, the Disclosure makes clear that the decision to participate in cross-plan offsetting is completely voluntary:

**Do plans have a choice in whether they participate in the Bulk Recovery Process?**

Yes. It is up to each self-insured plan whether or not to participate.

---

[3] As described above, the Disclosure explains that cross-plan offsetting provides self-funded plans with a greater chance of recovering an overpayment out of the broader pool of payments from all participating United administered plans.  App. 176; R. Doc. 44-1 at 6.  The Disclosure also explained that the benefits of cross-plan offsetting are received not only by self-funded plans, but also by United, which itself benefits from cross-plan offsetting by having an expanded pool from which to recover overpayments on behalf of fully-insured plans.  App. 176-177; R. Doc. 44-1 at 6-7.  The Disclosure also explains there is a risk that an out-of-network provider subject to an offset will seek to "balance bill[]" the participant for the amount they were compensated via offset,  App. 174; R. Doc. 44-1 at 4, while noting United is unaware of any instance of balance billing in response to an

App. 178; R. Doc. 44-1 at 8.[4]

Having received disclosures of the costs and benefits of the program, and of their opportunity to choose whether to participate or not, independent officials for both Plaintiffs' plans chose to participate in cross-plan offsetting, and included confirmatory instructions in the plans' Administrative Services Agreements ("ASA") with United and their Summary Plan Descriptions ("SPD") for participants. App. 14, 22; R. Doc. 35 at 14, 22; App. 227-44; R. Doc. 45-1 at 38-55.[5]

Plaintiffs received medical services from out-of-network providers. United subsequently determined that both of Plaintiffs' providers had previously received overpayments. Both providers were notified of the overpayment determinations and given the opportunity to appeal. App. 34-41; R. Doc 35 at 34-41; App. 263-94, 318-21; R. Doc. 45-1 at 74-105, 129-32. Plaintiffs' providers were subsequently notified in January and April of 2021, respectively, that the

---

offset. As the district court highlighted, Plaintiffs have not pleaded that any such balance billing has occurred. App. 67; R. Doc. 60 at 14.

[4] Plaintiffs' plans had the further option of authorizing cross-plan offsets only from payments to United's in-network providers to limit any potential risk of balance billing. App. 174; R. Doc. 44-1 at 4.

[5] As Plaintiffs' complaint referenced United's Disclosure, App. 14-15; R. Doc. 35 14-15 ¶¶ 32-33, Plaintiffs' plans' documents, App. 19-21; R. Doc. 35 at 19-21, and their providers' claims for payment, App. 34-41; R. Doc 35 at 34-41, the documents are "necessarily embraced" by the complaint and are appropriately considered at the motion to dismiss stage. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citations omitted).

Appellate Case: 23-2369     Page: 17     Date Filed: 10/13/2023 Entry ID: 5326098

outstanding debt was recovered through offsets against payments for services to Plaintiffs, and the associated overpayment debts were accordingly canceled. App. 265-68, 318-321; R. Doc. 45-1 at 76-79, 129-32. Plaintiffs do not allege that, in the more than two years since those notifications, either provider has taken any steps to request payment from Plaintiffs for the amounts United paid through debt cancellation. App. 68-69; R. Doc. 60 at 15-16. Nor do Plaintiffs allege that they received any communications from their providers indicating that the providers consider Plaintiffs to be indebted to them. *Id.*

## II. PROCEDURAL BACKGROUND

This lawsuit was brought by two patients who received medical care covered by health care plans sponsored by their employer or a family member's employer. App. 11-41; R. Doc. 35 at 11-41. It is notable that no employer or plan sponsor is a proponent of this suit, *id.*, indicating that "the behavior complained of is nothing other than what the plans expected." *In re Fid. ERISA Float Litig.*, 829 F.3d 55, 57 (1st Cir. 2016). This is not surprising: plan sponsors that opt their plans into United's cross-plan offsetting service choose to do so only after receiving full disclosure of the practice and of the fact that their participation is voluntary. App. 178; R. Doc. 44-1 at 8. Moreover, as the Complaint alleges, cross-plan offsetting has yielded billions of dollars in overpayment recoveries to self-funded plans like Plaintiffs', preserving plan resources for covered benefit claims. App. 28; R. Doc.

35 at 28 ¶¶ 63-64.

United moved to dismiss the complaint under Rule 12(b)(1) for Plaintiffs' lack of standing and under Rule 12(b)(6) because United is not a fiduciary for purposes of the plans' choice to engage in cross-plan offsetting and because the challenged practice does not violate ERISA.  App. 61-62; R. Doc. 60 at 8-9.  These arguments rested on Plaintiffs' Complaint, which failed to allege any actual or imminent harm to Plaintiffs and acknowledged that the payment terms that the fiduciaries of Plaintiffs' plans chose to include expressly provided for cross-plan offsetting.  App. 67-68, 74-75; R. Doc. 60 at 14-15, 21-22.

The district court agreed that Plaintiffs lacked Article III standing because they failed to plead that they suffered an injury in fact, and therefore did not reach United's Rule 12(b)(6) dismissal arguments.  App. 69, 75-76; R. Doc. 60 at 16, 22-24.  The district court appropriately limited its analysis "to the face of the complaint," and to only "documents outside the pleadings . . . 'necessarily embraced' by the complaint," concluding that "it is clear from the face of the complaint that Plaintiffs lack standing."  App. 62-63; R. Doc. 60 at 9-10 (citations omitted).  Assessing standing based on the "face of the complaint" was the correct standard at this stage, and, as discussed below, the district court applied that standard correctly.

Plaintiffs seek to mischaracterize the district court's ruling as being

11

premised on a rejection of the merits of their claim that the cross-plan offsetting provisions in their plans are invalid under ERISA.  Brief of Plaintiffs-Appellants, Doc. ID 5310869 at 14 ("Brief").  That is not the case:  to the contrary, the court's ruling was expressly premised on the lack of concrete harm to Plaintiffs.  The district court did not hold that payment by cross-plan offsetting was "valid;" rather, the court accepted for purposes of the standing analysis that cross-plan debt cancellation was not permitted by ERISA and correctly ruled that even a meritorious claim that the challenged conduct was unlawful did not create standing absent a concrete harm to Plaintiffs:

> Even if United violated ERISA by engaging in cross-plan offsetting, Article III standing requires a concrete injury even in the context of a statutory violation. . . . At bottom, Plaintiffs may take issue theoretically with United's means of consideration and its legality under ERISA.  But based on the facts Plaintiffs have alleged, they have not articulated an experienced financial harm that confers an injury in fact.

App. 68-69; R. Doc. 60 at 15-16 (citations omitted).

## SUMMARY OF THE ARGUMENT

To demonstrate the requisite "personal stake" in a case, a plaintiff "must be able to sufficiently answer the question:  'What's it to you?'"  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Plaintiffs' inability to answer that question demonstrates that the correct answer here is "nothing."  Plaintiffs do not allege that the balances in their bank accounts are one penny lower as a result of their plans'

Appellate Case: 23-2369     Page: 20     Date Filed: 10/13/2023 Entry ID: 5326098

specified payment mechanism, or that, if a court were to hold that their plans were limited to engaging in same-plan offsetting, they would be one penny better off. Nor do they allege that they face any risk—imminent or otherwise—of being one penny worse off due to the challenged practice.

On appeal, Plaintiffs have abandoned their primary argument below: that their purported debt to their providers creates a risk of future harm. Rather, Plaintiffs' new lead argument is that they have standing based on United's purported failure to pay their benefits as provided for in their plans. This contention cannot survive their own Complaint, which alleges that the conduct they complain of—the use of cross-plan offsetting—was expressly provided for under their plans. Where, as here, Plaintiffs do not allege that the **_actual_** terms of their contracts were breached, they cannot base standing on loss of contractual benefits.

Plaintiffs cannot avoid this result by alleging that ERISA does not allow such cross-plan offsetting provisions, and that the court should base standing on Plaintiffs' failure to receive the benefits of a different, **_hypothetical_** bargain. That is not a claim for "benefit of the bargain" standing, but rather a disguised effort to seek standing based on illegality. To support standing on a claim that United's conduct violates a statute, Plaintiffs need to allege concrete personal injury, which they fail to do.

13

Plaintiffs' fallback claim of economic injury asserts that their health care providers received debt forgiveness rather than cash, and, Plaintiffs assert, cash would have been more valuable. But this begs the same question: What's it to you? Plaintiffs devote four pages to explaining why debt forgiveness is purportedly less valuable than cash *to their providers*, but not a sentence to explaining why that makes any difference *to Plaintiffs themselves*. As multiple cases have explained, standing is a "particularized" inquiry, meaning that the alleged wrongdoing must affect the plaintiff in a personal and individual way. There is no special "doctor-patient" standing doctrine that allows the court to treat alleged harm to a health care provider as harm to the patient.

At bottom, Plaintiffs bring this suit based solely on their contention that the plan provisions to which they object violate ERISA. As the Supreme Court and this Court have repeatedly explained, however, being the subject of an action that allegedly violates the law is not sufficient to establish standing in the absence of concrete and particularized harm. And Plaintiffs have no concrete and particularized harm.

## ARGUMENT

Plaintiffs bear the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the pleading stage, plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Id*.

14

The "foremost" requirement of Article III standing is that the plaintiff has suffered "injury in fact," meaning an "'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Of most significance here, that means that the alleged injury must have affected the plaintiff in a "personal and individual way," and that the injury must be "real, and not abstract." *Id.* at 340 (internal quotations omitted).

Plaintiffs do not allege that they have suffered concrete injury in a "personal and individual way"—or, indeed, in any way. The Complaint is devoid of any allegation that the challenged method of payment has affected them ***at all***. Accordingly, applying the proper standard, the district court correctly ruled that Plaintiffs did not meet their burden of identifying a concrete and particularized injury.[6]

## I. PLAINTIFFS DO NOT HAVE "BENEFIT OF THE BARGAIN" INJURY BECAUSE THEY ALLEGE THAT THEY *RECEIVED* THE BENEFITS OF THE BARGAIN.

Plaintiffs' primary argument is that cross-plan offsetting caused them to receive less than they were due under the terms of their health care plans. An alleged deprivation of the benefits of a contractual bargain certainly constitutes

---

[6] Even if, as Plaintiffs incorrectly allege, the district court's conclusion rested on improper factual findings, affirmance is proper. This is a *de novo* appeal, and

"injury" for standing purposes, but Plaintiffs have no such injury because they allege that they were *not* deprived of the benefits afforded by their contract, but instead that United *complied with* a contract that is purportedly unlawful. No case cited by Plaintiffs (or known to United) has found benefit of the bargain standing where the core allegation of the complaint is that the actual contract terms were followed.

Where a plaintiff alleges breach of contract, his "'actual' injury" is the variance between what he received and what he was entitled to by the terms of his contract. *Carlsen v. GameStop, Inc*., 833 F.3d 903, 909 (8th Cir. 2016). Here, Plaintiffs do not allege that they received anything less than—or even different from—what their contracts afforded them. To the contrary, the Complaint alleges that the form of payment United used is a form of payment expressly provided for under their plans. As the district court correctly stated:

> Plaintiffs cannot plausibly allege that United breached the terms of the Plans. Plaintiffs repeatedly recognize that the Plans permit United to employ cross-plan offsets.

App. 75; R. Doc. 60 at 22.[7] In the face of those allegations, the district court was entirely correct in concluding that Plaintiffs' contention that they suffered a "denial

---

Plaintiffs' lack of standing is clearly demonstrable under governing authority as applied to the core allegations of the Complaint.

[7] This was not, as Plaintiffs suggest, impermissible fact-finding. The fact that Plaintiffs' plans provided for cross-plan offsetting was a core allegation of the

Appellate Case: 23-2369     Page: 24     Date Filed: 10/13/2023 Entry ID: 5326098

of benefits" (and thus a loss of the benefit of their bargain) was a legal conclusion, not a factual assertion to be credited for purposes of United's motion. App. 67; R. Doc. 60 at 14. Where, as here, a plaintiff alleges that the defendant's performance is the very performance permitted under the contract, the plaintiff has no "benefit of the bargain" injury on which to premise standing, and must find some other basis for proceeding in federal court.

Laid bare, Plaintiffs' core complaint is not that Plaintiffs received less than what was called for by the terms of their plans, but that the plan terms were allegedly unenforceable under ERISA. But it is established law that a plaintiff's claim that she was subjected to unlawful conduct does not provide for standing unless the plaintiff can demonstrate that she suffered a "concrete injury." *TransUnion*, 141 S. Ct. at 2205 ("Article III standing requires a concrete injury even in the context of a statutory violation."); *Thole v. U.S. Bank N.A*, 140 S. Ct. 1615, 1620-21 (2020) (allegations of ERISA violations not sufficient for standing where plaintiffs would be unaffected by whether the case was won or lost); *Ojogwu v. Rodenburg Law Firm*, 26 F.4th 457, 463 (8th Cir. 2022) (allegations of FDCPA violation insufficient to establish standing where plaintiffs suffered no tangible injury); *Braitberg v. Charter Commc'ns, Inc*., 836 F.3d 925, 925-26 (8th Cir. 2016) (alleged non-compliance with Cable Act insufficient to establish

---

Complaint and fully supported by the documents incorporated therein. App 14; R.

Appellate Case: 23-2369     Page: 25     Date Filed: 10/13/2023 Entry ID: 5326098

economic injury based on theory that non-compliance decreased value of services). As the district court correctly stated, "an injury in law is not an injury in fact." App. 64; R. Doc. 60 at 11 (citing *TransUnion*, 141 S. Ct. at 2205).

A plaintiff cannot claim "benefit of the bargain" standing where the plaintiff concededly received the benefit of the bargain that was struck, and instead merely alleges that those contract terms are unlawful. Plaintiffs cite a long list of "benefit of the bargain" standing cases, Brief at 28, but none recognizes "benefit of the bargain" standing in circumstances where the plaintiff's core claim was that the defendant's performance—though compliant with the actual contract—failed to measure up to a hypothetical contract that plaintiff insisted the law compelled. Plaintiffs' standing claim here is not based on the deprivation of any contractual rights, but rather on the assertion that United engaged in unlawful conduct, and that claim requires a showing of concrete injury, which is not alleged in this Complaint. *Thole*, 140 S. Ct. at 1620-21.

Plaintiffs' reliance on *Mitchell v. Blue Cross Blue Shield of N.D.*, 953 F.3d 529 (8th Cir. 2020), and similar cases is thus misplaced, because those decisions simply recognized benefit of the bargain standing where the defendants' performance allegedly failed to measure up to ***actual*** contract terms. For instance, the Mitchells brought a contract claim under ERISA for denial of benefits under §

---

Doc. 35 at 14 ¶ 31.

Appellate Case: 23-2369     Page: 26     Date Filed: 10/13/2023 Entry ID: 5326098

502(a)(1)(B), plausibly alleging that their plans' express terms entitled them to certain health care benefits and that Blue Cross failed to pay those benefits. *Id*. at 536. The "'concrete' injury" was the "denial of benefits" to which the *Mitchell* plaintiffs were "contractually entitled." *Id*. A plaintiff who has not received the benefits promised in her health plan suffers "[t]raditional[ ]" benefit of the bargain injuries because contractual breach "devalues the services for which the plaintiff contracted and deprives them of the benefit of their bargain." *Id*.

The discussion in *Mitchell* regarding payments to the providers and balance billing was simply the logical extension of the "benefit of the bargain" holding. If a plaintiff's contract entitles her to certain payments, and the contract allows her to direct payment to her doctor, then of course she has standing to sue if the doctor doesn't receive the payment promised by the contract, because payment to the doctor is what she expressly bargained for under the agreement. *Id*. That is, the defendant's failure to pay the doctor is a breach of what the defendant promised the plaintiff it would do. *Mitchell* does not pronounce, as Plaintiffs imply, a special doctor-patient standing rule that allows the court to ignore for all standing purposes whether the plaintiff has actually been harmed so long as her provider has been harmed. Brief at 30. To the contrary, *Mitchell* simply applies breach of contract standing rules to the assignment context, and the decision thus has no application where, as here, no breach of contract is plausibly alleged in the first

19

place.

Similarly, the fact that the provider did not issue a balance bill to the plaintiffs in *Mitchell* was irrelevant because, again, the Mitchells alleged breach of contract. An allegation of contractual breach alone suffices for standing, so the Mitchells did not need to make additional allegations of financial harm via a balance bill. Where a defendant's contract performance falls short of express contract terms, the breaching defendant has failed to honor its promise. That breach of promise in and of itself constitutes harm for Article III purposes. *Mitchell*, 953 F.3d at 536 ("party to a breached contract has a judicially cognizable injury for standing purposes because the other party's breach devalues the services for which the plaintiff contracted" (quotation omitted)). Analogously, if a contract provides for delivery of red widgets, the plaintiff who has received blue widgets need not allege that blue widgets are less financially valuable than red in order to have standing. Delivery of blue widgets is a breach of the agreement, and that breach suffices for standing as a traditional benefit of the bargain injury: no additional allegation of financial harm is required. Accordingly, the Mitchells, having alleged breach of contract, did not need to allege receipt of a balance bill or ***any*** additional harm beyond the contractual breach in order to establish standing. Here, however, Plaintiffs do not allege—and cannot plausibly allege—that United's performance violated Plaintiffs' plans' terms, so it was necessary for the

20

district court to consider whether Plaintiffs identified any other form of harm, whether via a balance bill or otherwise.

Put otherwise, *Mitchell* was, as this Court stated, simply the application of traditional breach of contract standing rules to the health insurance context. It did not purport to create entirely new standing eligibility rules where, as here, no breach of contract is alleged. And all of the other "benefit of the bargain" standing cases cited by Plaintiffs are to the same effect. They are all premised on the same point: that "a patient suffers a concrete injury if money that she is allegedly ***owed contractually*** is not paid, regardless of whether she has directed the money be paid to a third party for her convenience." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 193 (5th Cir. 2015) (emphasis added). These cases are inapt because United provided precisely the form of payment permitted by their plans, in complete fulfillment of Plaintiffs' bargain rather than in derogation of it. *See also Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 286-87 (6th Cir. 2018) (§ 502(a)(1)(B) suit for denial of benefits is a benefit of the bargain claim under "traditional principles of contract law" regardless of whether payment was to be made directly to the patients or to their assignees).

As the district court correctly stated, *Springer, N. Cypress,* and the other cases relied on by Plaintiffs are "distinguishable on the same basis as *Mitchell*:

21

Plaintiffs' plans permit cross-plan offsetting, so there was no denial of contractually-guaranteed benefits." App. 75; R. Doc. 60 at 22 n.9. Indeed, genuine claims for the denial of benefits are brought under ERISA § 502(a)(1)(B), and, as the district court correctly noted, no such claim was brought here. And for good reason: the Complaint does not allege that any benefits provided by the plans were not provided. App. 67; R. Doc. 60 at 14.

In short, while allegations that United's payments failed to conform to the plans' terms would establish "benefit of the bargain" standing, Plaintiffs do not—and cannot—make such allegations. It follows that they must establish some other form of harm, which, as discussed below, they fail to do.

## II. PLAINTIFFS' BID TO HAVE THEIR PLANS REFORMED—EVEN IF SUPPORTED BY THE COMPLAINT—IS A DISGUISED EFFORT TO IMPERMISSIBLY SEEK STANDING BASED MERELY ON AN ALLEGED STATUTORY VIOLATION.

On appeal, Plaintiffs offer a new argument in an attempt to sustain standing—namely, that their Complaint should be seen as, initially, seeking reformation of the contract between United and their employers to remove the cross-plan offsetting language, and then, following that relief, seeking the benefits of this hypothetical "bargain."[8] This argument fails at the first step: just as

---

[8] Plaintiffs do not use the term "reformation," but that is the doctrine pursuant to which contracts are judicially revised. *See Auctus Fund, LLC v. Drone Gaurder, Inc.*, 2023 WL 2401014, *8 (D. Mass. Mar. 8, 2023) (reforming contract in violation of usury law to lower interest rate to statutory maximum). And,

22

Plaintiffs have no standing to bring the claims they actually pleaded in the Complaint, Plaintiffs have no standing to seek reformation of the contracts negotiated by their plans' sponsors (who are not parties here) because the allegedly unlawful contractual provisions did not cause Plaintiffs "concrete injury." A suit for reformation of a contract to cure an alleged statutory violation is not seeking the benefit of any bargain—it is seeking to replace one contract with another. While such suits are ordinarily motivated by economic injury, no such injury is alleged here. Moreover, on a "facial" challenge to standing, the determination is based on the allegations of the complaint. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). Plaintiffs did not seek reformation of their plans in their Complaint against United—and, indeed, could not have done so without including the plans' sponsors as necessary parties.

A. <u>Plaintiffs may not assert "benefit of the bargain" standing based on a bargain that does not exist.</u>

A claim for reformation on the ground that a contract provision is unlawful is not a claim for enforcement of an actual bargain,[9] but rather a bid to enforce separate provisions of law—here, ERISA. And, as discussed above, a plaintiff may not ground standing solely on the asserted illegality of a defendant's conduct,

---

importantly, the Complaint does not and could not allege the necessary elements for equitable reformation.

[9] By contrast, for example, a claim for reformation due to scrivener's error would be a claim to enforce the agreement that the parties actually made.

23

without an allegation that the conduct caused concrete, personal injury. *TransUnion*, 141 S. Ct. at 2205.

Plaintiffs' contention is an apt example of a "conjectural and hypothetical" standing claim. *Spokeo*, 578 U.S. at 339 (quotation omitted). Plaintiffs ask this court to imagine that there is a different contract—one that does not have a cross-plan offsetting provision—and ask for the benefit of ***that*** contract. But any claim of "'concrete' injury must be 'de facto': that is, it must actually exist. . . . When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term— 'real' and not 'abstract.'" *Id*. "Benefit of the bargain" standing must be grounded in the breach of a promise actually made.

Crediting Plaintiffs' attempt to manufacture "benefit of the bargain" standing by permitting antecedent judicial intervention to modify the terms of the contractual bargain based on an asserted statutory violation alone, and without any demonstration of concrete harm, would stretch standing doctrine beyond all accepted bounds. Standing to sue for reformation, like standing to sue on any other claims, must be grounded in an assertion of concrete harm—for instance, reforming a usurious interest rate provision that would bring obvious monetary benefits to a debtor-plaintiff. But Plaintiffs are without any such antecedent economic interest here. Under their approach, a participant could always claim that any provision of his plan violates ERISA and assert that he has benefit of the

24

bargain standing to enforce a brand-new, hypothetical bargain shorn of the offending provision. This would obliterate the settled requirement that a plaintiff allege and prove concrete harm in order to obtain standing based on exposure to allegedly unlawful conduct. Unsurprisingly, none of the cases Plaintiffs cite recognize this "two-step" technique for manufacturing benefit of the bargain standing.

## B.    Standing cannot be based on claims not alleged.

On a motion to dismiss for lack of standing based on the face of the complaint, the court evaluates whether standing has been established based on the plaintiff's allegations. *Spokeo*, 578 U.S. at 338; *Auer v. Trans Union, LLC.*, 902 F.3d 873, 878 (8th Cir. 2018). There is no claim for reformation of Plaintiffs' plan terms (under any name) in Plaintiffs' Complaint. That is not an oversight: had Plaintiffs wished to seek reformation of the terms of benefit plans their employers put in place for the benefit of their workforces, their employers would have been necessary parties to that lawsuit. *United States. ex rel. Hall v. Creative Games Tech., Inc.*, 27 F.3d 572, 1994 WL 320296, at *1 (8th Cir. July 5, 1994) (per curiam) (affirming dismissal because "[i]t is simply inconceivable to us that a suit claiming that a contract is invalid should be allowed to proceed in the absence of all parties to the contract"); *Sch. Dist. of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 303 (6th Cir. 2009) (en banc) ("It is hornbook law that all parties to

25

a contract are necessary in an action challenging its validity or interpretation.").
The same would be equally true of any effort to reform the terms of Administrative
Services Agreements that Plaintiffs' employers concluded with United.

For the reasons explained, Plaintiffs' effort to manufacture benefit of the
bargain standing by first seeking a fundamentally different set of plan terms by
reformation would be legally defective even if the claim were included in their
Complaint. Yet having failed to include a reformation claim in their Complaint,
and having failed to seek leave to amend to do so, Plaintiffs' bid to surface a
brand-new claim for reformation *sub silentio* via their appellate brief is untimely
and improper. *Wiener v. E. Ark. Planting Co*., 975 F.2d 1350, 1357 n.6 (8th Cir.
1992) ("[W]e found no indication that [Plaintiffs] made this argument in the court
below—another reason not to consider it on appeal."); *Clarke v. Bowen*, 843 F.2d
271, 273 (8th Cir. 1988) ("We must reject counsel's efforts to raise an issue for the
first time on appeal as a basis for reversal.").

## III.  PLAINTIFFS DO NOT ALLEGE THAT THEY SUFFERED ANY ECONOMIC LOSS.

Plaintiffs' arguments for basing standing on economic loss only highlight
the fact that the cross-plan offsets are a matter of complete indifference to them.
They make the conclusory assertion that they were economically injured because
payment via cross-plan offsetting is allegedly less valuable than payment in cash.
But nothing in the Complaint supports the argument that this purported lesser value

Appellate Case: 23-2369     Page: 34     Date Filed: 10/13/2023 Entry ID: 5326098

makes any difference ***to them***.

A.  <u>Plaintiffs do not allege any out-of-pocket loss.</u>

As the Court reasoned in *Thole*, when standing is premised on economic loss, the court looks to whether the plaintiffs' economic position will change based on whether they win or lose the lawsuit.  Plaintiffs here fail that test, just as the *Thole* plaintiffs did:  winning this lawsuit will not put another penny in their bank accounts (or erase a single collection notice), and losing this lawsuit will not make them worse off by a penny either.  *Thole*, 140 S. Ct. at 1619.  They have, in the words of *Thole*, "no concrete stake in this lawsuit."  *Id*.  As the district court correctly stated, "had United not engaged in cross-plan offsetting, Plaintiffs would be out-of-pocket the same amount they are now."  App. 68; R. Doc. 60 at 15.  The alleged "underpayments" to their providers "are not losses to either Smith or Ghanim," meaning that Plaintiffs are simply taking issue with these offsets "theoretically."  App. 69; R. Doc. 60 at 16.

B.  <u>Plaintiffs do not assert that they risk future economic loss.</u>

Nor does the Complaint allege that Plaintiffs are at imminent risk of financial harm.  Despite relying on that argument in the district court, they have abandoned it on appeal.  In the lower court, Plaintiffs argued that they face the risk of future economic harm arising from a purported unpaid debt to their providers which they might someday be asked to pay.  That argument is now relegated to a

27

single, brief footnote, Brief at 31 n.14, devoid of any analysis or relevant authority. Failure to provide meaningful argument in support of a claim or argument in an appellate brief waives the argument on appeal. *Liscomb v. Boyce*, 954 F.3d 1151, 1154 (8th Cir. 2020); *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 807 (8th Cir. 2019); *Cox v. Mortg., Elec. Registration Sys., Inc*., 685 F.3d 663, 674 (8th Cir. 2012); *Ahlberg v. Chrysler Corp*, 481 F.3d 630, 634 (8th Cir. 2007).

Plaintiffs' "future harm" argument is meritless in any event, as the Ninth Circuit ruled in a similar case in which a plaintiff argued for standing to complain about cross-plan offsetting based on the supposed risk of future harm. *Ryan S. v. UnitedHealth Group*, 2022 WL 883743 (9th Cir. Mar. 24, 2022). First, to base standing on a risk of future harm, a plaintiff must show that she "is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and that the … threat of injury [is] both real and immediate." *McNaught v. Nolen*, 76 F.4th 764, 770 (8th Cir. 2023) (quotations omitted). *See also Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (to satisfy standing requirements, injury that is merely threatened must be "certainly impending"). The passage of over two years since Plaintiffs' providers learned of the offsets—without any request for additional payment from Plaintiffs, and without any communication even suggesting that the providers believe Plaintiffs are in debt to them—makes it inconceivable that Plaintiffs could satisfy this standard. Indeed, the possibility that

28

these providers even perceive Plaintiffs as being in debt to them is a matter of sheer speculation. The far more likely implication of the providers' two years of silence is that they have accepted the offsets as payment and moved on. As the district court stated, "the timeline of this litigation suggests that the providers are unlikely to balance-bill," given the passage of over two years since Plaintiffs' providers received the reports of the offsets, and that "none of the allegations suggest that a balance bill is certainly impending." App. 72, 74; R. Doc. 60 at 19, 21.

Second, as discussed above, the Complaint itself establishes that the offset form of payment allowed by Plaintiffs' plans is extremely common and widely accepted. The Complaint alleges that United has recovered billions of dollars in overpayments via cross-plan offsets on behalf of self-funded plans in recent years. App. 28; R. Doc. 35 at 28 ¶¶ 63-64. Plaintiffs' limitation of their proposed class to patients of out-of-network providers, App. 42; R. Doc. 35 ¶ 97, is an implicit concession that a provider's acceptance of payment by debt cancellation would obviate their claims, as in-network providers expressly agree in their contracts with United to accept cross-plan offsets. App. 175; R. Doc. 44-1 at 5. But the fact that Plaintiffs do not point to a single example in which an out-of-network provider has pursued a patient for a second payment in cash after being paid via cross-plan offsetting—despite billions of dollars in cross-plans offsets having occurred for

many years—indicates that this practice is generally (if perhaps grudgingly) accepted by out-of-network providers as well, and that pursuit of Plaintiffs for a duplicate payment in cash is, at best, a remote risk, and certainly not one that is "real and immediate," as required under *McNaught*.[10]

Third, alleged harms based on how third parties may act in the future are generally "too speculative" for Article III purposes. *McNaught*, 76 F.4th at 771. For that reason, in *Ryan S.*, the similar challenge to cross-plan offsetting addressed by the Ninth Circuit, the Court of Appeals rejected a claim of standing based on the member's potential responsibility to the provider for the amount paid by offset. *Ryan S.*, 2022 WL 883743, at *3.

Plaintiffs' abandonment of this argument puts in sharp relief their reliance on the earlier *Peterson* rulings. The one area of concern expressed by the lower court in *Peterson* as to potential harm to plan members in Plaintiffs' position was the risk of balance billing. *Peterson*, 242 F. Supp. 3d. at 844 (noting that cross-plan offsetting can benefit self-funded plans through administrative savings and increased recoveries of overpayments, but also can harm participants via balance billing). But Plaintiffs have elected to take that concern out of the equation, and

---

[10] Plaintiffs argue that the district court should not have drawn inferences from their failure to allege that any plan participant has been balance billed. Brief at 31 n.14. Yet, as it was the Plaintiffs' burden to plead facts establishing standing, it was certainly appropriate for the court to note their failure to make allegations that might support standing.

Appellate Case: 23-2369     Page: 38     Date Filed: 10/13/2023 Entry ID: 5326098

their efforts to plead standing based on some other form of alleged harm come to nothing.

C.   <u>Plaintiffs' conclusory assertion that payment by cross-plan offsetting is less "valuable" to them is not supported by any factual allegations in the Complaint.</u>

Plaintiffs' primary economic loss argument on appeal is that cross-plan offsets are less valuable ***to providers*** than cash. They argue that, because the costs to payors like United of recovering overpayments (through litigation or otherwise) in the absence of a cross-plan offsetting option are so high, providers might profitably "just say no" to overpayment recovery requests and expect to keep the overpaid money. Brief at 32-33. On this view, trading a dollar in cash for a dollar in debt forgiveness is trading something for nothing.[11] Putting aside the validity of this argument had it been asserted by a provider, not a single fact in the Complaint supports the assertion that this makes any difference whatsoever ***to Plaintiffs***.

Plaintiffs only have standing if they allege harm ***to themselves***. As a long line of cases in the Supreme Court and this Circuit have emphasized, the injury in fact test requires that "the party seeking review be himself among the injured" and

---

[11] Plaintiffs' less extreme version of this argument is that, due to high collection costs, United would have to forgive more than 100 cents on the dollar in order to induce a provider to accept debt reduction as a form of payment on currently-due claims. In other words, the argument seems to be that a provider could extract from United many dollars in debt forgiveness in return for giving up a dollar in cash and, thus, dollar for dollar offsets, as done here, leave the providers with less

"directly affected." *Lujan*, 504 U.S. at 556, 563. Similarly, the requirement that a plaintiff show that she suffered injury that is "particularized" means that the alleged wrongdoing "must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339. *See also Thole*, 140 S. Ct. at 1620 (in order to have standing to assert the interests of others, the plaintiffs themselves must have "a sufficiently concrete interest in the outcome of the issue in dispute"); *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1379 (8th Cir. 1997) (the "'third-party standing' rule thus 'normally bars litigants from asserting the rights or legal interests of others'" in support of standing (quotations omitted)); *Bassett v. Credit Bureau Servs., Inc*., 60 F.4th 1132, 1137 (8th Cir. 2023) (no standing where plaintiff "is not seeking to remedy any harm to herself"); *In re SuperValu, Inc*., 870 F.3d at 770 (no standing where complaint failed to allege "any injury 'to the plaintiff[s]'"). Whether or not the interests of Plaintiffs' *providers* in extracting greater compensation would give them standing to sue United is thus beside the point: Plaintiffs *themselves* have standing only if this alleged economic differential between cash and debt forgiveness affects them "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

Nor are Plaintiffs correct in suggesting that there is an exception to standing rules that allows the court to treat asserted harm to the provider as harm to the

_____

than they could obtain had Plaintiffs' plans elected not to participate in cross-plan

32

patient.  In breach of contract cases, where the defendant promised the plaintiff that it would  pay the plaintiff's doctor (or any other assignee), the breach of the promise to the plaintiff to pay the doctor gives the plaintiff standing just as would breach of any other promise made to the plaintiff.  In such a case, failure to pay the doctor is breach of the plaintiff's contract, and that breach gives the plaintiff "benefit of the bargain" standing to sue.  But here, there is no allegation that payment via debt cancellation breached any ***actual*** promise to Plaintiffs, as previously discussed.  And there is no rule that permits equating harm to the provider with harm to the patient.  To the contrary, a plaintiff must show harm to herself as an individual.  *Spokeo*, 578 U.S. at 339.

Plaintiffs contend that the Court should simply accept as true their unadorned allegation that the difference between cash and debt cancellation matters to them.  But the mere allegation that Plaintiffs "place a value" on something does not mean that the deprivation of that "something" caused any "concrete and particularized harm," especially where, as here, the Complaint does not adequately allege "that there was any effect on the value of the services" that they received.  *Braitberg*, 836 F.3d at 931; *see also Huyer v. Van de Vorde*, 847 F.3d 983, 987 (8th Cir. 2017) (actions that are simply disfavored by plaintiff do not constitute "injury in fact").

---

offsetting.  Brief at 35.

Appellate Case: 23-2369     Page: 41     Date Filed: 10/13/2023 Entry ID: 5326098

Moreover, Plaintiffs' insistence that the Court simply defer to an unsupported allegation that this differential matters to them is flatly inconsistent with the rule that a "naked assertion[ ]" of harm, "devoid of further factual enhancement, falls short of plausibly establishing injury." *Auer*, 902 F.3d at 878-79 (rejecting standing claims based on a "threadbare assertion" for which the complaint provided "no factual enhancement") (quotations omitted). *See also McNaught*, 76 F.4th at 771-72 ("plaintiff's burden to 'allege sufficient facts to support a reasonable inference' of injury at the pleading stage" requires her to show *how* the defendant's alleged actions harmed her") (emphasis in original). The entire concept of this purported differential in value between cash and debt forgiveness—let alone the purported linkage between the providers' interests and Plaintiffs'—is clearly in the realm of the "conjectural and hypothetical," which does not suffice for standing. *Spokeo*, 578 U.S. at 339. *See also Braitberg*, 836 F.3d at 930 (to be "concrete," an injury must "actually exist," and it must be "real, and not abstract."); *Ojogwu*, 26 F.4th at 463 (claimed intangible injury that did not cause plaintiff "to act to his detriment or fail to protect his interests . . . f[e]ll short of cognizable injury.").

Plaintiffs argue that, in the absence of cross-plan offsetting, overpayments are "effectively unrecoverable." Brief at 33. It is inconceivable that Plaintiffs and their plans would ***benefit*** from a system in which improper or even fraudulent bills

34

would be "effectively unrecoverable." But even if Plaintiffs could articulate some rationale as to why their plans are better off in a system where overpayments are "effectively unrecoverable," harm to their plans does not create standing for them. *Thole*, at 1620-21.

## IV. ALLEGED VIOLATIONS OF ERISA DO NOT CREATE STANDING IN THE ABSENCE OF CONCRETE HARM.

Finally, Plaintiffs argue that standing rules do not apply in the context of ERISA disputes—that Congress's enactment of ERISA "open[ed] the courthouse doors to employees," Brief at 40, irrespective of whether the requirements of standing have been met. Not so. This argument was flatly rejected in *Thole*, in which the plaintiffs alleged breach of ERISA duties, and were held to nevertheless lack standing because, like Plaintiffs here, they had no "concrete injury." *Thole*, 140 S. Ct. at 1620. Moreover, *Thole* did not accept the argument (reprised by Plaintiffs here) that standing should be afforded to plaintiffs who assert fiduciary breaches with "no further inquiry." That was the position urged only by the dissenting justices in *Thole*. *Id.* at 1629. There "is no ERISA exception" to standing rules. *Id.* at 1622.[12]

---

[12] In footnote 18 of their Brief (and in footnote below App. 349; R. Doc. 49 at 28 n.10), Plaintiffs also assert that "informational injury" (United's allegedly incorrect summary of Plaintiffs' accounts with their providers) provides them with standing. But *TransUnion*, 141 S. Ct. at 2205, rejects standing where the alleged misinformation does not result in any concrete adverse effects. Plaintiffs allege none, and in fact themselves acknowledge that their providers received notice of

Appellate Case: 23-2369     Page: 43     Date Filed: 10/13/2023 Entry ID: 5326098

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted,

*/s/ Gregory F. Jacob*

Gregory F. Jacob
(gjacob@omm.com)
Brian D. Boyle
(bboyle@omm.com)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006-4001
(202) 383-5327

Michelle S. Grant
(grant.michelle@dorsey.com)
DORSEY & WHITNEY LLP
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
(612) 340-5671

*Counsel for Defendants-Appellees
UnitedHealth Group, Inc.; United
HealthCare Services, Inc.; United
HealthCare Insurance Company; United
Medical Resources; United HealthCare
Service LLC*

---

the offsets and asserted objections to them. Brief at 33. In any event, Plaintiffs' passing reference to this injury in a footnote in their appellate brief waives the argument. *Cox*, 685 F.3d at 674 (argument waived after opening brief failed to provide "meaningful explanation of the argument"); *Raeburn v. Gibson*, 2021 WL 3871916, at *2 n.3 (8th Cir. Aug. 31, 2021) (a single passing reference to a state statute failed to meaningfully argue the state law claim resulting in waiver).

Appellate Case: 23-2369     Page: 44     Date Filed: 10/13/2023 Entry ID: 5326098

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App.

P. 32(a)(7) because this brief contains 8,829 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5)(A) and Fed. R. App. P. 32(a)(7)(B) because it was written in Times New

Roman, 14-point font.

3.     In accordance with Eighth Circuit Rule 28A(h), counsel states that

this brief and its addendum have been scanned for viruses and are virus-free.


*/s/ Gregory F. Jacob*
Gregory F. Jacob
Counsel for Defendants-Appellees

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically with the Court's CM/ECF system on October 13, 2023. Service will be effectuated by the Court's electronic notification system upon all parties and counsel of record.

*/s/ Gregory F. Jacob*
Gregory F. Jacob